Joseph M. Coleman (SBN 04566100)
John J. Kane (SBN 24066794)
S. Kyle Woodard (SBN 24102661)
**KANE RUSSELL COLEMAN LOGAN PC**
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4200
Telecopier: (214) 777-4299
E-mail: jcoleman@krcl.com
E-mail: jkane@krcl.com
E-mail: kwoodard@krcl.com

**PROPOSED COUNSEL FOR DEBTORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BAINBRIDGE UINTA, LLC, *et al.*,[1] | § | Case No. 20-42794 |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

## DECLARATION OF PAUL D. CHING IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITION AND FIRST DAY RELIEF

I, Paul D. Ching, pursuant to 28 U.S.C. §1746, hereby declare that the following is true to the best of my knowledge, information and belief:

1.     My name is Paul D. Ching. I am over the age of eighteen, and am fully competent to make this Declaration. I have never been convicted of a felony or crime of dishonesty or moral turpitude.

2.     I am the Chief Executive Officer of Bainbridge Uinta, LLC (**"Uinta"**) and Bainbridge Uinta Holdings, LLC (**"Holdings"**) (Uinta and Holdings collectively referred to as the **"Debtors"**). I have held this position since the Debtors' formation in or about August, 2018.

---

[1] The debtors in these Chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, include: Bainbridge Uinta, LLC (9240); and Bainbridge Uinta Holdings, LLC (9761). The location of the debtors' service address is 8150 N. Central Expy Suite 650, Dallas, Texas 75206.

3.      As CEO of the Debtors, I am knowledgeable about and familiar with the Debtors day to day operations, books and records, and business and financial affairs as well as the circumstances leading to the commencement of the Debtors Chapter 11 bankruptcy cases (the **"Bankruptcy Cases"** or **"Chapter 11 Cases"**) filed on September 1, 2020 (the **"Petition Date"**).  I submit this declaration (the **"Declaration"**) in support of the Debtors' voluntary petitions for relief and the motions and applications that the Debtors filed with the Court, including the "First Day" pleadings filed concurrently with this Declaration (the **"First Day Pleadings"**).  I am authorized to make this Declaration on behalf of the Debtors.

4.      On or about August 25, 2020, the Debtors conducted a board of managers meeting wherein the decision to commence a voluntary bankruptcy case was thoroughly discussed.  At and shortly after that meeting the requisite majority of managers indicated their approval for the Debtors commencement of these Bankruptcy Cases by executing that certain Omnibus Written Consent of Bainbridge Uinta Holdings, LLC and Bainbridge Uinta, LLC, which is attached to the Debtors' voluntary Chapter 11 bankruptcy petitions.

5.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information, my opinions based upon my experience, my knowledge of and experience with the Debtors' operations and financial condition and interviews my staff and I conducted with the Debtors' officers, managers, employees and professional advisors.

6.      Prior to becoming CEO of the Debtors, I worked in the E&P Oil and Gas industry for more than 45 years.  My experience includes, among numerous other assignments and responsibilities, (i) 34 years with Royal Dutch Shell in various senior executive positions and (ii) becoming the CEO and President of Meridian Resource Corporation, at the request of its Board, to right-size operations during an oil and gas downturn, during which I directed the implementation of

a fifty percent reduction of general and administrative expenses while maintaining flat production.

## OVERVIEW

### A.    DEBTORS' BACKGROUND AND SUMMARY OF BUSINESS OPERATIONS

7.      Uinta is an upstream oil and gas company, founded in 2018.  On or about September 25, 2018, the Debtors acquired the Three Rivers Field from Ultra Petroleum for a purchase price of approximately $75,000,000.  The Debtors' acquisition included approximately 8,258 gross leasehold acres.  The Debtors' mineral leases are with the Bureau of Land Management, Utah state governmental organizations and private lessors.  At the time of closing, the Three Rivers Field was comprised of 126 producing oil wells, 6 injection wells, 1 disposal well, 9 drilled but uncompleted wells, the associated pumping units, oil tanks, other surface equipment, field gathering system for oil, gas and water and related assets.  Currently, Uinta is the sole working interest owner, and operator of 146 producing wells, 6 injection wells and 1 disposal well in Utah's Uinta Basin.

8.      To finance the Debtors' 2018 acquisition, the Debtors entered into a loan agreement with White Oak Global Advisors, LLC (**"White Oak"** or **"Lender"**), borrowing an original principal amount of $62,500,000.  As of Petition Date, the total principal amount outstanding from the White Oak loan is approximately $61,900,000, which is not currently due and owing.  Also as part of the acquisition, the Debtors raised over $16.5 million in equity.  The Debtors successfully operated through year end, 2019, and established proved reserves of approximately $100 million.

### B.    EVENTS LEADING UP TO THE BANKRUPTCY FILING

9.      Unfortunately, the Global Covid-19 Pandemic and Saudi Arabia/Russian price war combined to cause a dramatic decrease in the demand for hydrocarbons resulting in a significant oversupply and commensurate decrease in prices.  Covid-19 rivals any prior crisis in terms of broad, immediate economic impact.  On March 7, 2020, Saudi Arabia announced 2.3 million barrel per day

production increase in response to Russia's failure to agree to a production cut.  The dual impact of these two global crises sent crude prices falling nearly 50% in just 7 trading days.

10.     On April 1, 2020, the Debtors responded to the global crisis and concurrent commodity price devaluation by (i) shutting in 54 wells that became uneconomic and (ii) reducing lease operating expenses and general and administrative costs.  Specifically, the Debtors reduced their Lease Operating Expenses by approximately $1.8 million from the First Quarter 2020 to Second Quarter 2020; decreased the officers' salaries by 20% starting August 1, 2020; and effective September 1, 2020, reduced all other employees' compensation by 15%.  The Debtors continued and focused efforts to reduce operating expenses have, in total, eliminated over $500,000 in monthly expenses.  That represents a greater than 40% decrease in operating expenses from the first quarter to the second quarter of 2020.

11.     Uinta has approximately 20 employees in Utah and Texas.  The Debtors' average monthly gross revenue in 2020 is approximately $3.4 million, consisting of proceeds from the production and sale of oil, gas, and natural gas liquids, and proceeds from certain "in the money" hedges with BP Energy Company.  The "waxy-textured" crude oil (pour point of 99 degrees Fahrenheit) produced by the Debtors requires heating to remain liquid.  As a result, the Debtors store their crude in heated tanks (160 degrees Fahrenheit).  Given the harsh nature of the oil produced by Uinta's wells, intense mechanical upkeep of the pumping units, motors, rod strings, down hole pumps, required chemicals and treatments to prevent scale, paraffin and corrosion are mandatory.  In addition, due to centralized locations and pad drilling encouraged by permitting agencies, allocation of production is required to properly assign production to leases.  Also, the complicated permitting process required to drill under Uinta's federal leases, as well as the intricate

and detailed surface and subsurface concerns under various State and Federal regulations,[2] including but not limited to rules and regulations under the Department of Interior, National Environmental Protection Act, Endangered Species Act, Paleontological Resources Preservation Act, National Park Service, and the U.S. Fish and Wildlife Service, takes the involvement of a varied team of professionals to accomplish. Consequently, the Debtors employ a team of extremely experienced oil and gas professionals.

## FIRST DAY MOTIONS

### A.    COMPLEX CASE DESIGNATION

12.    On the Petition Date, the Debtors' filed their *Notice of Designation as a Complex Chapter 11 Bankruptcy Case* (the **"Complex Case Designation"**), which I understand is in accordance with the General Orders of the Court when commencing the contemplated complex cases. I believe this designation is warranted because (a) the total claims asserted against the Debtors exceed the $10 million threshold, and (b) there are well over fifty (50) creditors and parties in interest in these Bankruptcy Cases, including mineral lessors, surface property lessees, customers, vendors, and other interested parties. Based on these factors, I believe the Debtors' Bankruptcy Cases should be designated and treated as complex Chapter 11 cases. I understand that treatment will allow the Debtors and their counsel to use a limited service list and set hearings on a more frequent basis. I believe that treatment will help the Debtors complete an effective and efficient restructuring without

---

[2] Many of the Debtors' leases are located in an area in which both state and federal regulatory agencies implement measures to protect cultural, archeological, paleontological, environmental, and endangered or protected species. Those measures materially complicate development. For example, the Debtors are currently working to permit development in a particular section of the Three Rivers Field adjacent to and partly on the Ouray National Wildlife Refuge managed by the U.S. Fish and Wildlife Service. In continuing effort to obtain appropriate permits, the Debtors have had, and will continue to have to undertake multiple paleontological, archeological, and hookless cactus surveys until the permitting authorities are satisfied and the applicable permits approved. As a result of the findings of those surveys, the Debtors must alter where they can place certain rights of way for field gathering lines to carry oil, gas, and water from surface locations to other locations away from the wildlife refuge. In addition, the Debtors are working with the State of Utah, U.S. Fish and Wildlife Service to minimize noise, road traffic, visual appearance, and the footprint of the Debtors' development.

incurring unnecessary administrative costs or prejudicing the interests of creditors or parties in interest.

**B.      CASH COLLATERAL MOTION**

13.      On the Petition Date, the Debtors filed their *Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Use Cash Collateral; (ii) Granting Adequate Protection; (iii) Modifying the Automatic Stay; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* (the **"Cash Collateral Motion"**) seeking entry of interim and final orders allowing the Debtors' continued use of cash collateral postpetition.  The Debtors are borrowers under that certain Loan, Guaranty and Security Agreement with White Oak, dated as of September 25, 2018 (the **"Prepetition Loan"** and, together with the related loan documents, agreements, or instruments executed in connection with the Prepetition Loan, and as amended, restated, modified or supplemented, the **"Prepetition Loan Documents"**). The Prepetition Loan provided for a senior secured term loan credit facility of up to $62.5 million. As of August 31, 2020 and subject to the 90 day Challenge Period, as defined in the Cash Collateral Motion, the Debtors are liable to White Oak in the principal amount of $61,900,000, although that amount is not currently due and owing (the **"Prepetition Indebtedness"**).

14.      The Use of Cash Collateral is imperative to preserve assets of the Debtors' bankruptcy estates.  The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these Bankruptcy Cases and to preserve the value of their assets for the benefit of all parties-in-interest. Substantially all of the Debtors' total cash on hand as of the Petition date is subject to White Oak's liens and thus constitutes Cash Collateral.  The Debtors have no source of cash aside from the cash proceeds from the operation of the Debtors' oil and gas business and, potentially, proceeds from the liquidation of certain Hedges as detailed below.

15.      The Debtors continue to incur expenses associated with the management of their ongoing operations, the extraction of oil and gas, collection of receivables, the protection and

maintenance of the Debtors' assets, and the administration of the Debtors' estates during the course of these Bankruptcy Cases. It is essential that the Debtors continue to fund their ongoing operating expenses, payroll obligations, insurance expenses, bonds, and other financial obligations. The Debtors' ability to use Cash Collateral is absolutely critical to the continuation of the Debtors' existing operations.

16. Immediate access to Cash Collateral will restore the confidence of the Debtors' vendors, customers, employees, and other stakeholders at this critical stage of their restructuring. Accordingly, the use of Cash Collateral in accordance with the terms of the Interim Order is essential to the Debtors' ability to minimize disruptions and avoid irreparable harm to their business.

17. If not allowed to use cash collateral, the Debtors and the value of their assets would suffer greatly and irreparably. Significant damage would be done to the Debtors' oil and gas and related operations. First, the Debtors would have to shut-in all of its wells. Given the Debtors' "waxy-textured" crude, which has a shoe polish consistency if not heated at 90 degrees or more, all of the Debtors' flow lines, heat treaters and other equipment would be significantly damaged, and much of it would not be repairable. Second, it would cost hundreds of thousands of dollars to repair and replace the equipment, heat the crude, and otherwise take the necessary steps to turn the wells back on after they are shut-in. Those processes would be very time consuming and labor intensive, and the Debtors would generate minimal revenue while attempting to restart operations. Third, without use of the Cash Collateral as set forth on the Budget, there would be no staff to report to governmental lessors, such as the Bureau of Land Management and State of Utah, which could jeopardize the mineral leases, permits, and related bonds. Fourth, mineral lessors would have the right to terminate certain leases, particularly if the lack of production continues for a period of time. Fifth, without using the Cash Collateral, there would be risk of environmental damage. In short, without use of Cash Collateral, the Debtors, their assets, the Debtors' creditors and other

constituencies would be severely and irreparably damaged.

18.     White Oak asserts liens on the Debtors' Cash Collateral. As adequate protection for the Debtors' use of Cash Collateral, the Debtors are proposing to provide White Oak with, among other protection, the following adequate protection payments and replacement liens:

a.      **Principal and Interest Payments**.  Significantly, the Debtors were not in monetary default at the time they commenced their Bankruptcy Cases.  The Debtors will continue to make all the monthly interest (non-default rate) payments and quarterly principal payments timely as due under the Prepetition Loan Documents (the "**Adequate Protection Payments**") from the Petition Date until the Debtors no longer use the White Oak's Cash Collateral.  While the Debtors' monthly interest payment obligation varies with the number of days in a given month, the September 1, 2020 interest payment owed to White Oak totaled $423,843.06, which the Debtor's paid on August 31, 2020.  The Debtors will pay the next quarterly principal payment to White Oak, in the amount of $200,000, when due on October 1, 2020.  I believe that the Adequate Protection Payments fully compensate White Oak for any potential decrease in their collateral after the Petition Date.

b.      **Replacement Liens**. As further adequate protection, the Debtors will grant the White Oak valid and automatically perfected (without necessity of the execution of additional mortgages, security agreements, pledge agreements, financing statements, or other documents) replacement liens and security interests in substantially all of the Debtors' assets, to the same extent, validity and priority as White Oak's liens and security interest as of the Petition Date, specifically including all cash proceeds arising from the Prepetition Collateral, as defined in the Cash Collateral Motion, including oil and gas, accounts receivable and other assets acquired after the Petition Date (but excluding any causes of action under chapter 5 of the Bankruptcy Code and proceeds thereof), in the same nature, extent, priority, and validity that such liens existed on the Petition Date (the "**Replacement Liens**"). The Replacement Liens will secure White Oak to the extent necessary to adequately protect White Oak from any diminution in value of its interests in the property of the Debtors' estates as a result of the use of Cash Collateral.

c.      **Super-Priority Claim**.  To the extent the Adequate Protection Payments and Replacement Liens granted to White Oak in this Interim Order do not provide White Oak with adequate protection of its interests in the Cash Collateral, White Oak shall have, upon notice and hearing and a subsequent Court Order, super-priority administrative expense claims in each of the Bankruptcy Cases under Bankruptcy Code § 507(b) with priority over every other administrative claim of any kind (the "**Super-Priority Claims**").

d.      **Reporting Requirements**.  The Debtors' will continue to provide White Oak with information and will otherwise fulfill the reporting requirements set forth in the Prepetition Loan Documents.

19.     I believe that the proposed Adequate Protection, outlined above and as set forth in the proposed Interim Cash Collateral Order, is sufficient to secure the Debtors' projected use of Cash Collateral because any decrease in the value of White Oak's collateral from the use of Cash Collateral is less than the value of the Adequate Protection provided to White Oak.

20.     Significantly, the Debtor proposes to pay, postpetition, all principal and interest at the non-default rate as and when due under the Prepetition Loan Documents.  Moreover, the use of Cash Collateral is itself is a form of Adequate Protection as it allows the Debtors to preserve and potentially increase the Debtors' overall going concern value by operating during the restructuring process.  Finally, the Debtor has agreed to only spend Cash Collateral in accordance with a Budget, attached to the Cash Collateral Motion as Exhibit A, within very specific variances.  I was personally involved and approved the Budget. In my judgment, the Budget represents the proper, necessary, and required expenditures to protect the Debtors' assets and its creditors over the next four weeks, taking into account the expense reductions described above.

21.     Finally, unless otherwise authorized by the Court (and excluding ordinary course of business salary, benefits and expense reimbursement), the Debtors will not make any payments to any shareholders, officers, directors, or managers of the Debtors or to any affiliates thereof without further Court order or the consent of White Oak.

## C.     MOTION TO PAY PREPETITION ROYALTY OBLIGATIONS

22.     The Debtors filed their *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Royalties and (II) Granting Related Relief* (the **"Royalties Motion"**) and, in doing so, seek entry of interim and final orders authorizing the Debtors to pay or apply in the ordinary course of business any and all amounts owed in connection with the Royalties (as defined herein), whether incurred prepetition or postpetition.  The Debtors operate approximately 146 oil and gas wells, 6 injection wells, and 1 disposal well in the State of Utah.  Debtors have entered into

numerous oil and gas leases in connection with these wells. Pursuant to the terms of these leases, the lessors (**"Lessors"**) conveyed an interest in the minerals that they own to the Debtors in exchange for, among other things, a right to receive a royalty interest. Those royalty interests are based upon the agreed royalty rate in the lease which grants the royalty owner a cost free share (subject to certain post-production costs) of the proceeds from the oil and gas produced on the leased property (the interest being referred to as a **"Royalty Interest"** and the resulting payments as **"Royalties"**). The Lessors include the Federal Bureau of Land Management, the State of Utah, and numerous individuals and entities. Attached as an exhibit to the Royalty Motion is a true and correct schedule of the Debtors' mineral leases, from which the Lessors or their assigns are entitled to be paid the Royalties.

23. To the best of my knowledge, none of the Lessors are insiders, affiliates or otherwise related to the Debtors or the Debtors' officers, directors or managers.

24. Failure to pay the Royalties would have a severe negative effect on the Debtors and their interests in the subject leases. Royalties are governed by the terms of the leases or the other documents pursuant to which the Royalty Interests were created and, commonly, state statutory frameworks that set strict payment deadlines and contain enforcement mechanisms, including interest, fines, recovery of costs and attorneys' fees, and, in some cases, punitive damages. Failure to pay Royalties could expose the Debtors to such enforcement actions, as well as actions by the owners of the Royalty Interests for conversion or damages for breach of the relevant leases or other document creating such Royalty Interests. Failure to pay Royalties could also expose the Debtors to the forfeiture, cancellation, or termination of leases, particularly with respect to leases granted by the United States, agencies of the State of Utah, and leases in which termination is a contractual or state law remedy for non-payment. Accordingly, the Debtors request approval to pay prepetition Royalties and to continue making Royalty payments in the ordinary course of business on a

postpetition basis.

25.     The amount of Royalties owed to the Lessors in a given month varies due to many factors, including the specific terms of the applicable leases, the commodity price for that particular month, severance taxes, post-production costs, changes in ownership, and changes in the amount or type of minerals captured. The Debtors' Royalty payment obligations totaled approximately $327,000 per month over the last six months. In the twelve months before the Petition Date, the Debtors remitted Royalties in an aggregate amount of approximately $5.9 million. Royalty payments are remitted by the Debtors throughout the course of a given month. As a result of the time required to market and sell the production and the significant accounting processes required each month to accurately disburse the resulting proceeds, the Debtors typically pay Royalties about two months in arrears, although in some instances Debtors pay estimated Royalties for the prior month and then pay any difference from the actual Royalties two months later.

26.     The Debtors estimate that, as of the Petition Date, the Debtors have approximately $654,000 in accrued but unpaid Royalties. Accordingly, the Debtors request authority to pay prepetition amounts due and owing to lessors in the ordinary course of business and to continue honoring Royalties in the ordinary course of business on a postpetition basis, in each instance subject to the Debtors' rights to dispute asserted amounts and to withhold payment pending resolution of any such dispute.

27.     The relief requested in the Royalties Motion is necessary to prevent severe disruption of the Debtors' operations. Authorizing payment of pre and postpetition Royalties in the ordinary course of the Debtors' business will send a clear signal to the marketplace, including the Lessors, that the Debtors are willing and, importantly, able to conduct business as usual during these Bankruptcy Cases. On the other hand, if the relationships established by the Debtors with the Lessors are harmed, whether through non-payment or perceived difficulties of working with a

Chapter 11 debtor, the Debtors may be unable to secure future opportunities with those parties, and other third parties may be unwilling to engage in new business with the Debtors going forward. If that were to occur, the negative impact on the Debtors' business, their estates, and creditors would be substantial. Indeed, such a result would be value destructive at the outset of these cases.

28.     Based on the dire consequences that would result if the Debtors fail to pay Royalties, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.

29.     Payment of the Royalties is absolutely critical. First, as described above, each of the Lessors arguably hold real property interests in the Debtors' oil and gas interests, so failure to turn over the proceeds of lessors' property would significantly harm the Debtors' operations. Second, failing to pay the Royalties when due could result in lawsuits against the Debtors, liens being placed on the Debtors' oil and gas interests, including proceeds therefrom, contractual and/or statutory penalties and/or possible termination of leases. In addition to the potential exposure to the Debtor for such matters, the time and cost attendant to dealing with such matters could significantly disrupt the Debtors' businesses and restructuring process, which could cost the Debtors' estate a substantial amount in lost revenue. Accordingly, the harm and economic disadvantage that would stem from failure to pay any of the prepetition Royalties is grossly disproportionate to the amount of the prepetition claims that would have to be paid. And, third, with respect to each of the Lessors, the Debtors have determined that, to avoid significant disruption of the Debtors' business operations, there exists no practical or legal alternative to payment of the prepetition Royalties.

D.     MOTION TO CONTINUE HEDGE PROGRAM

30.     On the Petition Date, the Debtors also filed their *Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors To: (I) Perform Under Pre-Existing Hedge Agreements; (II) Liquidate or Otherwise Monetize Hedge Agreements; (III) Enter Into Post-Petition Hedge Agreements; (IV) Grant Security*

*Interest and Liens to Obtain Post-Petition Hedge Agreements; and (V) Granting Related Relief* (the **"Hedges Motion"**). As detailed above, the Debtors are primarily engaged in oil and natural gas development and production activities in Utah. The Debtors have a diversified proved reserve base comprised largely of oil, natural gas, and natural gas liquids. Historically, the Debtors have hedged a significant portion of their forecasted oil and natural gas production to reduce exposure to commodity price fluctuations and to provide long-term cash flow predictability. That predictability allows the Debtors to manage their business and service their debt.

31.     Uinta's hedges are evidenced by certain financial derivative contracts with BP Energy Company (**"BP"**) in the form of a series of swap agreements evidenced by an ISDA Master Agreement dated September 25, 2018 and governed by the ISDA March 2013 DF Supplement (the **"Swaps"**).

32.     The Swaps and swap transactions are summarized in certain letter agreements (the **"Confirmations"** and, with the Swaps, the **"Hedges"**). Each of the Confirmations has a unique Reference Number and provides the specific hedge transaction terms, such as the effective date, termination date, volume subject to the agreement, prices, payment obligations, and payment deadlines. The Confirmations and Swaps are attached as an exhibit to the Hedges Motion.

33.     Uinta currently hedges approximately 75% of its production of oil and gas. Given the precipitous decline in commodity prices during the first and second quarter of 2020, Uinta is now in a beneficial position under its Hedges. Uinta currently receives approximately $600,000 to $700,000 of monthly revenue from BP under its Hedges, depending on commodity prices. While Uinta realizes substantial monthly revenue from the Hedges, it could also liquidate the Hedges for a large lump-sum to fund ongoing operations or, should the market forecasts support it, additional drilling operations. Because hedging transactions like the Hedges are frequently traded on an open market, BP could effectuate a liquidation of the Hedges at the prevailing market rate upon Uinta's

request. Alternatively, Uinta could likely liquidate the Hedges at a specific price per barrel. Uinta estimates that the current mark-to-market value of its Hedges exceeds $9 million.

34.     The Swaps are part of a continuous hedging program (the **"Hedge Program"**) that provides the Debtors with much-needed pricing predictability by allowing them to hedge against the deleterious effects of price fluctuations in an increasingly volatile oil and natural gas market. The Debtors wish to continue their Hedge Program post-petition, though seek authority to alter their Hedge Program as needed in the ordinary course of their business and pursuant to their business judgment.

35.     The appropriate level of production to be hedged is an ongoing consideration and based on a variety of factors, including current and future expected commodity market prices, cost and availability of put option contracts, the level of acquisition activity, and the Debtors' overall risk profile, including leverage, size, and scale considerations. Further, when commodity prices are depressed and forward commodity price curves are flat or regressive, the Debtors may determine that the benefit of hedging their anticipated production is outweighed by costs associated with the Debtors' potential inability to obtain higher revenues for their production if commodity prices recover during the term of potential contracts. Simply put, the Debtors' seek freedom to determine the appropriate percentage of production volumes to be hedged over time, and to enter into hedges if the Debtors' deem such actions prudent in their business judgment.

36.     The Prepetition Loan restricts the Debtors from entering into certain hedge agreements unless those agreements are with an "Approved Counterparty". An Approved Counterparty is defined in section 1.1 of the Prepetition Loan as "(a) any Person who is a Lender or an Affiliate of a Lender, (b) any Person if such Person has (or the credit support provider of such Person has) a long term senior unsecured debt rating is A-/A3 by S&P or Moody's (or their equivalent) or higher or (c) any Secured Non-Lender Hedge Counterparty." A Secured Non-Lender

Hedge Counterparty is defined in the same section as "(a) an investment grade-rated industry participant that is approved by the Required Lenders (such approval not to be unreasonably withheld, delayed, or conditioned) (or such counterparty's obligations are guaranteed by such a Person), (b) BP Energy Company or (c) otherwise approved by the Administrative Agent and the Required Lenders; *provided* that, any such counterparty shall have entered into and remain subject to a Swap Intercreditor Agreement."

37.     By the Hedges Motion, the Debtors seek authorization from this Court to continue their Hedge Program in accordance with the terms and conditions of the Prepetition Loan Documents, Swaps, Bankruptcy Code, and other applicable law, which may include Debtors entry into additional Hedges with an Approved Counterparty in order to ensure ongoing operating stability and to mitigate potential downside risk. Debtors also seek authorization to liquidate their Hedges in the ordinary course of business and subject to their business judgment as necessary to maximize the value of their estates and benefit to their creditors.

## E.     CASH MANAGEMENT MOTION

38.     As of the Petition Date, the Debtors maintain a cash management system (the "**Cash Management System**") that permits the Debtors to fund their ongoing operations. The Debtors' pre-petition Cash Management System requires, among other things, the movement of funds among and between the Debtors and various bank accounts. The Debtors' Cash Management System is administered by the Debtors' officers, primarily the Debtors' Chief Financial Officer, and includes reporting, fund collection, and fund disbursement functions, among other things.

39.     I understand that the U.S. Trustee has established certain operating guidelines for debtors-in-possession in order to supervise administration of chapter 11 bankruptcy cases (the "**U.S. Trustee Guidelines**"). I further understand that the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, (a) close all existing bank accounts and open new "debtor-in-

possession" bank accounts; (b) establish one debtor-in-possession account for all estate monies required for payment of taxes, including payroll; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks for all debtor-in-possession accounts that bear the designation "Debtor-in-Possession," the bankruptcy case number, and the type of accounts. The Debtors submit, however, that implementing these guidelines would require a substantial modification, if not abandonment, of their pre-petition Cash Management System, and would disrupt ongoing operations.

40. The Debtors' Cash Management System includes two bank accounts, each held with CrossFirst Bank (the **"Cash Management Bank"** or **"Bank"**). The Debtors' bank accounts are identified and described as follows (collectively, the **"Bank Accounts"**):

| Debtor | Bank | Acct. No. | Description |
|---|---|---|---|
| Bainbridge Uinta, LLC | CrossFirst Bank 2021 McKinney Ave, Ste 800 Dallas, TX 75201 | ****9628 | General Operating Account (Checking) |
| Bainbridge Uinta, LLC | CrossFirst Bank 2021 McKinney Ave, Ste 800 Dallas, TX 75201 | ****2260 | AP Operating Account (Checking) |

41. All of the Debtors' revenues are generated by and payable to Uinta, and all distributions are made by Uinta. Consequently, Holdings does not have any bank accounts. In that regard, the bank accounts are utilized in the Cash Management System as follows:

a. Bank Account No. ****9628. All revenues[3] are deposited into the Bank Account ending 9628 (the **"Operating Bank Account"** or **"Operating Account"**). Distributions from the Operating Account include, among other things: (i) Royalties; (ii) employee payroll; (iii) credit card payments to MasterCard; (iv) operating expenses; and (v) payments to third parties such as Paychex, White Oak, and the Debtors' outside professionals.

b. Bank Account No. ****2260. No revenues are deposited into to the Bank Account ending 2260 (the **"AP Bank Account"** or **"AP Account"**). Funds are deposited into the AP Account only via transfers from the Operating Account, and only on an as-

---

[3] All revenues from oil and gas sales are received on the 20th day of the subsequent month following the sale.

needed basis. The AP Account is used primarily for accounts payable disbursements. The only other disbursements from this account are insignificant credit card payments to American Express.

42. Each of the Bank Accounts is subject to a Deposit Account Control Agreement between the Debtors, White Oak, and Crossfirst Bank executed on or about September 25, 2018 (each a **"DACA"**). Pursuant to the DACAs, White Oak could take control of the Debtors' Bank Accounts following an event of default and submission to Crossfirst Bank of a certain "Notice of Sole Control." I believe that White Oak's exercise of such a draconian remedy would devastate the Debtors' operations.

43. Monthly fees to the Cash Management Bank associated with the Bank Accounts (the **"Bank Fees"**) are typically less than $200 per month. The Bank automatically draws Bank Fees from the Bank Accounts on the 15th and 25th days of each month, meaning that no Bank Fees are known to be owed an outstanding on the Petition Date

44. The Debtors' Cash Management System also includes two corporate credit card accounts, each maintained in Uinta's name (collectively, the **"Credit Card Accounts"**). One Credit Card Account is held with the Cash Management Bank on MasterCard's payment network (the **"MasterCard Account"**), and the other is held with American Express (the **"Amex Account"**). The MasterCard Account is the Debtors' primary Credit Card Account. Payments to the MasterCard Account are automatically drafted from the Debtors' Operating Bank Account between the 22nd and 24th day of each month. The Debtors rarely use the American Express credit cards (the **"Amex Cards"**), and payments on the Amex Account are typically less than $1,000 per month.

45. The MasterCard Account is primarily used for business expenses, and each employee has a MasterCard credit card (the **"MasterCards"**) to be used for such purpose. The Debtor's field personnel in Utah each have fuel MasterCards to purchase fuel while traveling to and from production sites and to cover the expenses of maintaining the Debtors' company vehicles driven by

those employees. These fuel MasterCards have purchase restrictions and are only accepted for fuel and other vehicle-related expenses. The Debtors' corporate personnel in Dallas each have MasterCards to pay for general business expenses incurred within the scope of their employment.

46. The Debtors' operations will be severely disrupted if the Credit Card Accounts are disabled or terminated for any reason, such as non-payment. Among other things, the Debtors would have no way of sending personnel into the field to service and monitor its oil and gas wells, storage tanks, pumping units, or any other related assets necessary to maintaining operations. Not only will this negatively impact the Debtors' ability to generate revenue, it will also prevent the Debtors from properly maintaining and servicing the estate's assets.

47. The Cash Management System procedures constitute an ordinary, usual, and essential business practice and are consistent with those used by similar corporate entities. The Cash Management System provides significant benefits to the Debtors and their estates. Among other things, the Cash Management System allows the Debtors to (a) control and monitor the collection and transfer of funds, (b) ensure cash availability, (c) reconcile intercompany transactions, (d) monitor pre- and post-petition payments and payment obligations, and (e) maximize investment income and to reduce administrative burdens and expenses. Maintaining the Debtors' current Cash Management System will preserve the integrity of the Debtors' books and records and ensure the Debtors are capable of expeditiously and accurately preparing detailed financial reports. Failure to continue the Cash Management System would disrupt the Debtors' operations and impose a financial burden on the estates, while providing little benefit, if any, to the Debtors' estates and creditors.

48. Consequently, I believe that the maintenance of the existing Cash Management System during these Cases is in the best interest of the Debtors, their estates, and their creditors. Continued use of the Cash Management System will facilitate the Debtors' transition into

bankruptcy by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting the system and minimizing delays in the payment of post-petition obligations. Thus, in order to avoid disruption of their operations and ensure an orderly transition into bankruptcy, the Debtors request this Court's authorization to continue to use their existing Cash Management System, including the Bank Accounts and Credit Card Accounts (as it may be modified by the Debtors in the ordinary course of business).

49.     As part of the Cash Management System, the Debtors utilize numerous pre-printed business forms (the **"Business Forms"**) in the ordinary course of their business. The Debtors also maintain books and records to document, among other things, their profits and expenses. To avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that this Court authorize their continued use of all Business Forms, including, without limitation, letterhead, purchase orders, invoices, and pre-printed and future checks, as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms as required under the U.S. Trustee Guidelines.

50.     On behalf of the Debtors I submit that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their Business Forms substantially in the forms existing immediately before the Petition Date, but without the additions of "debtor-in-possession" case styling on the checks, as required by the U.S. Trustee. Parties doing business with the Debtors undoubtedly will be aware of their status as debtors-in-possession; thus, changing Business Forms beyond the Debtors' printable check stock is unnecessary and would be unduly burdensome.

## F.     EMPLOYEE WAGES AND BENEFITS MOTION

51.     In order to preserve the Debtors' ability to continue operations for the benefit of the estates, as well as to preserve employee morale, the Debtors have filed an *Emergency Motion for Entry*

*of an Order (I) Authorizing Debtors to Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses; (II) Continuing Employee Benefits Programs; and (III) Granting Related Relief* (the **"Wages Motion"**) seeking authority to, in the ordinary course of business:

a. pay all pre- and post-petition obligations related to wages, salaries, other compensation, payroll taxes and deductions, reimbursable employee expenses, payroll benefit providers, employee benefits, service fees, and all costs related to the foregoing (collectively, the **"Employee Obligations"**);

b. collect and pay all pre- and post-petition Employment Taxes (as defined in the Wages Motion);

c. reimburse employees for all pre- and post-petition business expenses incurred within the scope of their employment (**"Business Expenses"**);

d. maintain and continue established practices, programs, and policies in place for employees, including those related to (i) medical insurance, prescription drug insurance, dental insurance, vision insurance, health savings accounts and flexible spending accounts; (ii) life insurance, accidental death insurance, and disability insurance; and (iii) the employees' 401(k) plan (collectively, **"Employee Benefits"**), and pay all pre- and post-petition obligations related to Employee Benefits;

e. continue using Paychex as a third party provider of all the Debtors' payroll, benefits, and human resource functions; and

f. pay all pre- and post-petition processing fees, costs, and expenses associated with the payment and administration of the Employee Obligations and Employee Benefit Obligations, including fees and charges owed to Paychex.

52. I believe that failure to pay the Debtors' Employees will certainly jeopardize the stability of the Debtors' employment force and thereby the Debtors' ability to continue operations as necessary to reorganize in Chapter 11. To maintain employee stability and productivity, it is important that Employee Obligations are paid in full, and that the Employee Benefits are continued post-petition without interruption.

53. The Debtors have twenty (20) employees (the **"Employees"**), all of whom are employed full-time by Uinta—the Debtors' operating entity. Holdings does not have any employees. Eleven Employees are paid a salary (**"Salaried Employees"**), and nine are paid hourly

("**Hourly Employees**"). All nine Hourly Employees and two Salaried Employees work as field personnel in Utah providing the Debtors with oil and gas production-related services. The remaining nine Employees work in the Debtors' corporate headquarters in Dallas, Texas. The Debtors' workforce is summarized as follows:

| Location | Salaried Employees | Hourly Employees | Total Employees |
|---|---|---|---|
| Dallas (Headquarters) | 9 | 0 | 9 |
| Vernal, Utah (Field) | 2 | 9 | 11 |
| **Total:** | **11** | **9** | **20** |

54. The Employees have specific skillsets and areas of expertise acquired over years working in the oil and gas industry, which are essential to the Debtors' operations. The Debtors do not run a typical oil and gas operation because the crude oil produced from the Three Rivers field has certain "waxy" properties, different from the crude produced in other parts of the country. For the Debtors, getting crude to market requires specialized production and storage methods, as well as intense and near continuous efforts to maintain equipment. Consequently, the Debtors' Employees and their respective skills, knowledge, and understanding of the Debtors' business, customers, and infrastructure are critical to the Debtors' ongoing operations. Without them, the Debtors' operations would cease. As noted above, a cessation of operations would likely prove catastrophic for the Debtors, and would almost certainly and immediately diminish the value of the Debtors' estates. I believe that an effective reorganization will prove impossible without the Employees' continued uninterrupted services.

55. The Debtors outsource all payroll, benefits, and human resource services to a third party called Paychex. The Debtors pay Paychex a $115.01 administration fee per Employee each payroll period, in addition to certain other fees and charges incurred from time to time. Paychex provides the Debtors with an efficient means of administering payroll, benefits, and human resources.

56. The Employees' hourly wages and salaries are paid semi-monthly on the fifteenth (15th) and final (30th or 31st) days of each month (**"Payroll Dates"**); unless a Payroll Date falls on a weekend, in which case payment is made on the preceding Friday. Each pay period, Paychex calculates the total compensation and withholdings for all of the Debtors' Employees and automatically withdraws that amount from the Debtors' bank account on the day before the Payroll Date. Paychex then disburses all tax and benefits withholdings to the applicable party for each employee—*i.e.*, tax withholdings are remitted to the applicable state or federal authority,[4] 401(k) withholdings are remitted to the plan administrator, and insurance withholdings are remitted to the insurance provider.[5] In other words, the Debtors do not directly pay its Employees' salaries and wages; rather, those amounts are paid to Paychex, who then disburses payment to the Employees after accounting for the proper withholdings.

57. All Employees are paid by Paychex via direct electronic bank deposits. Each individual Employee is paid less than $13,650 per paid period. With respect to Hourly Employees, compensation is paid seven (7) days in arrears, meaning that Hourly Employees will be owed accrued but unpaid compensation as of the Petition Date. Salaried Employees are *not* paid in arrears. Because August 31, 2020 was a Payroll Date, all Salaried Employees were paid current. Consequently, no Salaried Employee is owed prepetition wages as of the Petition Date.

58. The first post-petition Payroll Date will be September 15, 2020. For Salaried Employees, the applicable pay period runs from the Petition Date through September 14, 2020. With respect to Hourly Employees, however, the applicable period runs from August 23 through September 5, 2020, meaning that Hourly Employees are owed one week of accrued and unpaid

---

[4] The Debtors are current on all payroll taxes due and payable as of the Petition Date.

[5] Paychex is not the actual provider or administrator of any benefits offered to the Debtors' Employees, such as the 401(k) plan, medical insurance, life insurance, etc.

prepetition wages. However, no Hourly Employee is paid more than $41 per hour, meaning that no Employee is owed, or will receive, prepetition compensation exceeding $13,650.

59. Certain Employees also have accrued and unused paid time off (**"PTO"**), which is accrued annually by the hour. The Employees' PTO does not carry over to the next year; it is lost if not used in the year it was accrued. In the ordinary course of business, and subject to Court approval, the Debtors intend to allow Employees to use and be paid for accrued PTO. As of the Petition Date, the Employees collectively have accrued a total of approximately 2,532 hours of unused PTO during 2020.

60. The Debtors have procedures in place for reimbursing Business Expenses. Consistent with past practice, Business Expenses incurred by an Employee must be submitted to the Employee's supervisor for approval. Once approved, Business Expenses are processed and reimbursed through Uinta's accounts payable department, and are paid by check to the Employees separate from the Employees' regular payroll compensation. However, Business Expenses are rarely submitted to the Debtors for reimbursement; the Debtors' Employees have incurred only $605 in reimbursable Business Expenses year-to-date in 2020. This is because all Employees are issued company credit cards under the Debtors' corporate account to pay for Business Expenses, leaving few situations in which Employees must use personal funds for business expenditures.[6] Notwithstanding, the Debtors cannot say for certain that no reimbursable Business Expenses are accrued and unpaid as of the Petition Date, because such expenses are often not submitted for reimbursement until several days after the fact. I believe it would be inequitable, harm Employee morale, and cause undue hardship to deny reimbursement of such Business Expenses. All such expenses are incurred on behalf of the Debtors in the ordinary course of business and with the

---

[6] The field Employees' company cards have purchase restrictions and may only be used for fuel and vehicle-related expenditures. Field Employees often drive long distances as part of their employment, but each is provided with a company vehicle such that those Employees do not accrue reimbursable Business Expenses for vehicle mileage.

expectation that such expenses would be reimbursed in accordance with past practice.

61.     The Debtors have established certain practices, programs, and policies related to Employee Benefits in the ordinary course of business.  The Employee Benefits provided by the Debtors include: (i) medical insurance, prescription drug insurance, dental insurance, vision insurance, health savings accounts and flexible spending accounts; (ii) life insurance, accidental death insurance, and disability insurance; and (iii) a 401(k) Plan.  The manner in which expenses are incurred and claims are processed in connection with the Employee Benefits makes it difficult for the Debtors to calculate the extent of outstanding Employee Benefit Obligations on any given day. Employee Benefits are paid by Paychex after securing payment from Uinta via invoice sent to Uinta's bank.  The Debtors estimate their annual contributions for Employee Benefits total approximately $484,000.00.[7]

62.     The Debtors' 401(k) plan is administered by Paychex.  Employees may contribute certain eligible pay (on a pre-tax basis for traditional 401(k) accounts).  Paychex withholds these amounts from each payroll and such amounts are remitted to Employee 401(k) immediately after the payroll date.  The Debtors match Employees' 401(k) contributions up to five percent (5%).  The Debtors seek to continue their Employee Benefits postpetition, and seek authority to satisfy all Employee Benefit Obligations.

### G.     MOTION FOR JOINT ADMINISTRATION

63.     Pursuant to the Debtors' *Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Bankruptcy Cases* (the **"Joint Administration Motion"**), the Debtors request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only.  There are two Debtors and well over fifty (50) creditors and parties in interest in these

---

[7] The Debtors estimate that Employees contribute approximately $304,000 annually to Employee Benefits and the Debtors pay approximately $484,000, for a total of $788,000 in annual benefit contributions.

Bankruptcy Cases. I believe that joint administration of these Bankruptcy Cases would save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders. Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The United States Trustee for the Northern District of Texas (the **"U.S. Trustee"**) and other parties in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers, and having to prepare and file duplicative pleadings when necessary.

64.     I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of the Debtors' cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

## H.     MOTION TO LIMIT NOTICE – THE CREDITOR LIST MOTION

65.     The Debtors have filed an *Emergency Ex Parte Motion for an Order Limiting Notice and Granting Related Relief* (the **"Creditor List Motion"**) requesting an order, which I am advised is pursuant to Rule 2002(m) of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and this Court's *Guidelines for Mailing Matrices and Shortened Service Lists in Complex Chapter 11 Cases* (the **"Local Notice Guidelines"**), establishing limited noticing requirements with respect to all proceedings in these cases. Specifically, I understand that the Debtors seek authority, in accordance with the Local Notice Guidelines, to establish a consolidated service list consisting of: (a) the Debtors and its professionals; (b) secured creditors; (c) the Debtors' twenty (20) largest unsecured creditors; (d) any official committees and their professionals; (e) the United States Trustee; (f) the IRS and other relevant governmental entities; and (g) all parties who have requested notice in these

cases (the **"Official Limited Service List"**).

66.    I understand that, because the Debtors have filed the Joint Administration Motion and Complex Case Designation, the Local Notice Guidelines contemplate that the Debtors may file an Official Limited Service List to avoid the expensive, time consuming, and burdensome requirement of preparing and filing separate service lists.  The Official Limited Service List will help alleviate undue administrative burdens, costs, and the possibility of duplicative service.  Accordingly, the Debtors request authority to file the consolidated Official Limited Service List for both Debtors.

67.    The Debtors further request approval of the proposed *Notice of Requirement for Filing Written Request with Court to be Included on Official Service List for Notice of Proceedings* (the **"Service List Notice"**) attached to the Creditor List Motion.  I believe that the Service List Notice will sufficiently apprise all parties of the notices they will receive in these Bankruptcy Cases and the actions they must take if they wish to receive additional notices and pleadings filed in these Bankruptcy Cases.  I further believe that approval of the Official Limited Service List and Service List Notice will serve to prevent confusion among creditors and parties in interest in this Case.

I.    **MOTION FOR EXTENSION OF TIME TO FILE SCHEDULES AND STATEMENTS**

68.    The Debtors have also filed their *Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief* (the **"Extension Motion"**).  In it, the Debtors seek entry of an order: (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the **"Schedules and Statements"**) for an additional 21 days, for a total of 35 days after the Petition Date, through and including October 6, 2020, without prejudice to the Debtors' ability to request additional extensions if the Debtors show that cause exists warranting the

extensions.

69.     I understand from discussions with counsel that section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c) ordinarily require debtors to file their Schedules and Statements within 14 days after their petition date, but that pursuant to Bankruptcy Rules 1007(c) and 9006(b), the Court has authority to extend the Debtors filing deadlines "for cause."  I believe that ample cause exists to extend the Schedules and Statements deadlines in this case.

70.     To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each Debtor entity.  Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees. Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.  Moreover, given the ongoing COVID-19 crisis, many of the Debtors' employees have been and currently are hindered in their ability to access the materials to compile the necessary information to prepare the Debtors' Schedules and Statements.

71.     In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for these chapter 11 cases.  Focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases will facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

## J.     APPLICATION TO RETAIN KANE RUSSELL COLEMAN LOGAN PC AS DEBTORS' COUNSEL

72.     On the Petition Date, the Debtors filed their *Application Pursuant to 11 U.S.C. §*

*327(a), Bankruptcy Rules 2014 and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Retain and Employ Kane Russell Coleman Logan PC as Attorneys for Debtors Effective as of Petition Date* (the **"KRCL Application"**), seeking entry of an order authorizing the Debtors to retain the law firm of Kane Russell Coleman Logan PC (**"KRCL"**) as Debtors' restructuring counsel.

73.     The Debtors request that the Court approve the retention of KRCL as their attorneys to perform the extensive legal services that will be required during these chapter 11 cases in accordance with KRCL's normal hourly rates in effect when services are rendered and KRCL's normal reimbursement policies, as detailed in the KRCL Application and related attachments.

74.     The Debtors believe that their respective bankruptcy cases involve numerous issues that will require them to retain counsel having special skill and experience in bankruptcy matters. To that end, the Debtors sought counsel who: (i) is willing to undertake this representation; (ii) has sufficient experience and capacity to handle the numerous and potentially complex issues that will be raised and addressed; and (iii) does not have a conflict of interest in representing the Debtors in these cases. KRCL's lead attorney on this matter, Joseph M. Coleman, possesses over thirty years' experience in the practice of bankruptcy law and creditor rights, is a member of the State Bar of Texas, and is admitted to practice in the Northern District of Texas.

75.     KRCL began providing legal representation to the Debtors on or about August 17, 2020 in connection with a review of the Debtors' corporate organization, lending relationships, financial status and related issues and the challenges the Debtors are facing. KRCL also advised the Debtors with regard to alternatives and strategies to preserve and maximize value with regard to their assets. As a result of its prepetition representation of the Debtors, KRCL possesses an in-depth knowledge of the Debtors' capital structure and has gained additional insight into the current condition of the Debtors' business, operations and lending relationship. Accordingly, the Debtors believe KRCL is uniquely situated with the necessary background to address the potential legal

issues that may arise in the context of the Debtors' Bankruptcy Cases.

76.     The Debtors have been informed that Joseph M. Coleman, a director of KRCL, as well as other directors and associates of KRCL who will be employed in these chapter 11 cases, are members in good standing of, among others, the Bar of the State of Texas and the United States District Court for the Northern District of Texas.  Accordingly, the Debtors believe KRCL is both well qualified and uniquely able to represent the Debtors in their chapter 11 cases in an efficient and timely manner.

77.     The Debtors seek to retain KRCL so that they may provide the scope of services identified in the KRCL Application (the **"Scope of Services"**).  The Debtors believe that KRCL's performance of its Scope of Services will be appropriate under the circumstances, and necessary to enable the Debtors to execute faithfully their duties as debtors and debtors in possession and to prosecute their Bankruptcy Cases.

78.     As detailed below, the Debtors have filed an application to employ Oak Hills Securities, Inc., as financial advisors.  The Debtors may also need to retain additional professionals in connection with the administration of their Bankruptcy Cases and the Debtors' ordinary course operations.  Rather than resulting in any extra expense to the Debtors' estates, I anticipate that the efficient coordination of efforts of the Debtors' attorneys and other professionals will greatly add to the progress and effective administration of these Bankruptcy Cases.

79.     The Debtors have been informed that KRCL has attempted to determine its past and present involvement, if any, with any party in interest appearing in these cases.  Except as set forth more fully in the Mr. Coleman's declaration, which was filed in conjunction with the KRCL Application, I understand that KRCL has no connection of any kind or nature with the Debtors, the Debtors' creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the U.S. Trustee.  I am unaware of any other

relationship that presently causes a disqualification, a conflict of interest, or otherwise renders KRCL ineligible to serve as counsel for the Debtors.

80.     Subject to the Court's approval of the KRCL Application, the Debtors have agreed to the employment of KRCL as counsel at the hourly rates set forth in the KRCL Application, with retainers, compensation and advances of expenses to be paid in accordance with orders of the Court.  The Debtors have an immediate need to retain counsel so that the Debtors can begin their duties as a debtors-in-possession.  Accordingly, the Debtors request the Court promptly permit the Debtors to retain KRCL after adequate notice to parties in interest.

### K.     UTILITIES MOTION

81.     On the Petition Date, the Debtors also filed their *Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* (the "**Utilities Motion**").  In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, telecommunications, internet, and other similar services (the "**Utility Services**") from a number of utility companies (each a "**Utility Provider**").  A nonexclusive list of Utility Providers that provide Utility Services to the Debtors as of the Petition Date (the "**Utility Services List**") is attached to the Utilities Motion.  The relief requested in the Utilities Motion is requested for all Utility Providers providing Utility Services to the Debtors.

82.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, therefore, the overall success of these Chapter 11 cases.  The Debtors' business involves developing, producing, and selling oil, natural gas, and natural gas liquids and the Debtors must maintain their ability to run and monitor their production equipment in a near-constant state. In addition to production processes conducted in the field, the Debtors require telecommunications

and internet services to operate their corporate offices. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. That disruption could jeopardize the Debtors' ability to manage their restructuring efforts, and to generate cash flow needed to maintain successful postpetition operations. Accordingly, it is essential that the Utility Services continue uninterrupted during these Bankruptcy Cases.

83. To the best of the Debtors' knowledge, there are no defaults or arrearages with respect to invoices for prepetition Utility Services. On average, the Debtors pay approximately $7,180 each month for Utility Services, excluding electricity provided by Moon Lake Electric Association Inc. (**"Moon Lake"**). The Debtors are currently parties to an $80,000 Utility Bond for the benefit of Moon Lake, their oil field energy provider, which will expire on September 13, 2020. To the best of the Debtors' knowledge, they do not have any existing prepayments, bonds, or deposits for the benefit of any other Utility Providers.

84. To provide additional assurance of payment, the Debtors propose to provide Moon Lake with a $40,000 cash deposit to serve as security against the non-payment of utilities (the **"Moon Lake Deposit"**). The Debtors' operations use a considerable amount of electricity provided by Moon Lake; the proposed Moon Lake Deposit is an amount approximately equal to one month of energy services provided by Moon Lake. Without Moon Lake's electricity, the Debtors cannot operate a large number of their wells. Accordingly, Moon Lake's energy is required to maintain operations and the cash flow projected in the Debtors' cash collateral budget. The Debtors' believe the Moon Lake Deposit is therefore reasonable and necessary under the circumstances, and provides Moon Lake adequate assurance of payment.

85. In addition, the Debtors will deposit $7,500 into a segregated debtor-in-possession account (the **"Adequate Assurance Account"**) in order to provide all other Utility Providers

assurance of payment (the **"Utilities Deposit"**). The Utilities Deposit consists of approximately one month of utilities typically owed to all Utility Providers other than Moon Lake. The Utilities Deposit will be held in the Adequate Assurance Account for the duration of these Chapter 11 cases. The Debtors will deposit the Utilities Deposit into the Adequate Assurance Account within 7 days of this Court's entry of an order approving this Motion.

86.     The Moon Lake Deposit and Utilities Deposit, when taken in conjunction with the Debtor's cash flow from operations and cash on hand (collectively, the **"Proposed Adequate Assurance"**), confirms the Debtors' ability to pay all future Utility Services in accordance with their prepetition practices and in accordance with their ordinary course of business. As a result, the Proposed Adequate Assurance constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code. *See* 11 U.S.C. § 366.

## CONCLUSION

87.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.

Dated: September 1, 2020.

*/s/ Paul D. Ching*
Name: Paul D. Ching
Title: Chief Executive Officer

Deposit will be held in the Adequate Assurance Account for the duration of these Chapter 11 cases. The Debtors will deposit the Utilities Deposit into the Adequate Assurance Account within 7 days of this Court's entry of an order approving this Motion.

86.     The Moon Lake Deposit and Utilities Deposit, when taken in conjunction with the Debtor's cash flow from operations and cash on hand (collectively, the **"Proposed Adequate Assurance"**), confirms the Debtors' ability to pay all future Utility Services in accordance with their prepetition practices and in accordance with their ordinary course of business.  As a result, the Proposed Adequate Assurance constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.  *See* 11 U.S.C. § 366.

### CONCLUSION

87.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.

Dated:  September 1, 2020.

_____
Name:  Paul D. Ching
Title:  Chief Executive Officer